RIDER "A" TO SUMMONS IN
ALLSTATE INSURANCE COMPANY v. CONRAD ROBERT WILLIAMS, M.D., et al.

**Full Caption:**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ALLSTATE INSURANCE COMPANY,

Plaintiff,

Docket No.:_____ (        )

-against-

CONRAD ROBERT WILLIAMS, M.D.,
TARGEE MEDICAL SERVICES, P.C.,
MICHAEL I. BLEY, M.D.,
ALLMED MEDICAL OF WILLIAMSBURG, P.C.,
BARRY ALAN DUBLIN, M.D.,
FLATLANDS MEDICAL, P.C.,
MICHAEL GEORGE ALLEYNE, M.D.,
MICHAEL ALLEYNE MEDICAL DOCTOR, P.C.,
VICTOR R. SHAROBEEM, M.D., and
VAS MEDICAL, P.L.L.C.,

**Plaintiff Demands a
Trial by Jury**

(collectively the "Clinic Defendants")

-and-

MARAT TSIRLIN, M.D.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**Named Defendants:**

**Conrad Robert Williams, M.D.**
1115 Rivington Street
Roselle, NJ 07203

**Targee Medical Services, P.C.**
c/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**Michael I. Bley, M.D.**
525 East 80th Street, Apt. 4D
New York, NY 10075

**Allmed Medical of Williamsburg, P.C.**
c/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**Barry Alan Dublin, M.D.**
75 West End Avenue, Apt. P27B
New York, NY 10023

**Flatlands Medical, P.C.**
c/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**Michael George Alleyne, M.D.**
6591 162nd Street, Apt. 4L
Fresh Meadows, NY 11365

**Michael Alleyne Medical Doctor, P.C.**
c/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**Victor R. Sharobeem, M.D.**
8 Steeple Drive
Hillsborough, NJ 08844

**VAS Medical, P.L.L.C.**
c/o New York Secretary of State
41 State Street - Albany, NY 12231-0001

**Marat Tsirlin, M.D.**
2949 Brighton 4th Street
Brooklyn, NY 11235

Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Michael Stanton (MS 1772)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiff Allstate Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ALLSTATE INSURANCE COMPANY,

                           Plaintiff,

            -against-

CONRAD ROBERT WILLIAMS, M.D.,
TARGEE MEDICAL SERVICES, P.C.,
MICHAEL I. BLEY, M.D.,
ALLMED MEDICAL OF WILLIAMSBURG, P.C.,
BARRY ALAN DUBLIN, M.D.,
FLATLANDS MEDICAL, P.C.,
MICHAEL GEORGE ALLEYNE, M.D.,
MICHAEL ALLEYNE MEDICAL DOCTOR, P.C.,
VICTOR R. SHAROBEEM, M.D., and
VAS MEDICAL, P.L.L.C.,

(collectively the "Clinic Defendants")

           -and-

MARAT TSIRLIN, M.D.,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (      )

**Plaintiff Demands a
Trial by Jury**

## COMPLAINT

Plaintiff Allstate Insurance Company ("Allstate" or "Plaintiff"), by and through its counsel, Rivkin Radler LLP, as and for its Complaint against the Defendants, hereby alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,270,000.00 that the Defendants wrongfully have obtained from Allstate by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance bills relating to initial and follow-up examinations (the "Examinations"), digital range of motion and muscle tests (the "ROM/Muscle Tests"), spirometry tests (the "Spirometry Tests"), functional capacity evaluation tests (the "FCE Tests"), transcutaneous electrical nerve stimulation sessions (the "TENS Sessions"), neurological consultations (the "Consultations"), and electrodiagnostic tests (the "EDX Tests") (collectively the "Fraudulent Services"). These services purportedly were rendered for diagnostic and pain management purposes to individuals ("Insureds") who were involved in automobile accidents and were eligible for insurance coverage under Allstate no-fault insurance policies.

2.      The Defendants never had any right to bill for or to collect no-fault benefits for many of the Fraudulent Services in the first instance, because the Fraudulent Services were performed by independent contractors, rather than by employees of Targee Medical Services, P.C., Allmed Medical of Williamsburg, P.C., Flatlands Medical, P.C., Michael Alleyne Medical Doctor, P.C., and VAS Medical, P.L.L.C. (collectively the "PC Defendants").  In addition, the Defendants never had any right to bill for or to collect no-fault benefits on their charges because the Fraudulent Services were medically useless in general, and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols that

were designed and employed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to Allstate.

3.      Accordingly, in addition to damages, Allstate seeks a declaration that it is not legally obligated to pay more than $887,000.00 in pending claims for Fraudulent Services submitted through the PC Defendants because: (i) the Fraudulent Services that were billed to Allstate through the PC Defendants were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants; (ii) the Fraudulent Services that were billed to Allstate through the PC Defendants in many cases never were performed in the first instance; and/or (iii) the PC Defendants were ineligible to bill for or recover No-Fault Benefits for many of the Fraudulent Services in the first instance, because the Fraudulent Services were performed by independent contractors.

4.      The Defendants fall into the following categories:

(i)      Conrad Robert Williams, M.D., Michael I. Bley, M.D., Barry Alan Dublin, M.D., Michael George Alleyne, M.D., Victor R. Sharobeem, M.D., Targee Medical Services, P.C., Allmed Medical of Williamsburg, P.C., Flatlands Medical, P.C., Michael Alleyne Medical Doctor, P.C., and VAS Medical, P.L.L.C. (collectively the "Clinic Defendants") are individuals licensed to practice medicine in the State of New York, and the professional medical corporations that they purport to own and control. The Clinic Defendants submitted charges to Allstate for medically unnecessary Fraudulent Services that they ordered and performed, or caused to be ordered and performed, pursuant to pre-determined, fraudulent protocols. Moreover, the Clinic Defendants submitted charges to Allstate for Fraudulent Services that in many cases never were performed in the first instance. In addition, the Clinic Defendants billed Allstate for Fraudulent Services that were performed by independent contractors, in violation of New York law.

(ii)     Marat Tsirlin, M.D. is an individual licensed to practice medicine in the State of New York who has been associated with Defendants Targee Medical Services, P.C. and Flatlands Medical, P.C. as an

3

independent contractor, where he purported to perform Consultations and EDX Tests and issued phony reports based on the fraudulent Consultations and EDX Tests that, with his knowledge, ultimately were used to support fraudulent billing submitted to Allstate.

5.  As discussed below, the Defendants at all relevant times have known that:

(i)  the Fraudulent Services were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to Allstate and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)  in many cases, the Fraudulent Services never were performed in the first instance;

(iii)  the current procedural terminology ("CPT") codes, or billing codes, used in the billing for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Allstate; and

(iii)  in many cases, the Clinic Defendants were ineligible to bill for or collect no-fault benefits for the Fraudulent Services in the first instance, inasmuch as the Fraudulent Services frequently were performed – to the extent that they were performed at all – by independent contractors, rather than by the PC Defendants' employees.

6.  As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services. The charts attached hereto as Exhibits "1" through "5" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to Allstate. The Defendants' respective interrelated schemes began as early as 2007 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, Allstate has incurred damages of more than $1,270,000.00.

## THE PARTIES

### I.   Plaintiff

7.      Plaintiff Allstate Insurance Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

8.      Defendant Conrad Robert Williams, M.D. ("Williams") is a physician who was licensed to practice medicine in New York in 1983, and who resides in and is a citizen of New Jersey. Williams purports to be the sole owner, shareholder, and director of Defendant Targee Medical Services, P.C.

9.      Defendant Michael I. Bley, M.D. ("Bley") is a physician who was licensed to practice medicine in New York in 1986, and who resides in and is a citizen of New York. Bley purports to be the sole owner, shareholder, and director of Defendant Allmed Medical of Williamsburg, P.C.

10.     Defendant Barry Alan Dublin, M.D. ("Dublin") is a physician who was licensed to practice medicine in New York in 1995, and who resides in and is a citizen of New York. Dublin purports to be the sole owner, shareholder, and director of Defendant Flatlands Medical, P.C.

11.     Defendant Michael George Alleyne, M.D. ("Alleyne") is a physician who was licensed to practice medicine in New York in 1983, and who resides in and is a citizen of New York. Alleyne purports to be the sole owner, shareholder, and director of Defendant Michael Alleyne Medical Doctor, P.C.

5

12.     Defendant Victor Sharobeem, M.D. ("Sharobeem") is a physician who was licensed to practice medicine in New York in 1990, and who resides in and is a citizen of New Jersey. Sharobeem purports to be the sole owner, shareholder, and director of Defendant VAS Medical, P.L.L.C.

13.     Defendant Targee Medical Services, P.C. ("Targee") is a New York professional service corporation with its principal place of business in New York. Targee was incorporated on or about December 31, 2007.

14.     Defendant Allmed Medical of Williamsburg, P.C. ("Allmed") is a New York professional service corporation with its principal place of business in New York. Allmed was incorporated on or about March 5, 2008.

15.     Defendant Flatlands Medical, P.C. ("Flatlands") is a New York professional service corporation with its principal place of business in New York. Flatlands was incorporated on or about April 3, 2008.

16.     Defendant Michael Alleyne Medical Doctor, P.C. ("MAMD") is a New York professional service corporation with its principal place of business in New York. MAMD was incorporated on or about December 27, 2007.

17.     Defendant VAS Medical, P.L.L.C. ("VAS") is a New York professional service corporation with its principal place of business in New York. VAS was incorporated on or about February 5, 2007.

18.     Defendant Marat Tsirlin, M.D. ("Tsirlin") is a physician who was licensed to practice medicine in New York in 2004, and who resides in and is a citizen of New York. Tsirlin has been associated with Targee and Flatlands, and at all relevant times worked in the capacity of an independent contractor.

6

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws

21.     Allstate underwrites automobile insurance in the State of New York.

22.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the medically necessary healthcare services that they require. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to hereinafter as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for healthcare goods and services.

24.     An Insured can assign his or her right to No-Fault Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company and receive payment for medically necessary services that it provides, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

25.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

26.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the service. Under the New York No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer,

where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

27.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3s submitted by a healthcare provider to Allstate, and to all other insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Billing for Independent Contractor Services

28.     Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

29.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in February 21, 2001 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services

rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals); <u>See</u> <u>DOI Opinion Letter</u>, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (Copies of the relevant DOI Opinion letters are attached hereto as Exhibit "6").

30.     Williams has been the only physician employed by Targee.

31.     Bley has been the only physician employed by Allmed.

32.     Dublin has been the only physician employed by Flatlands.

33.     Alleyne has been the only physician employed by MAMD.

34.     Sharobeem has been the only physician employed by VAS.

35.     None of the technicians who have performed Fraudulent Services that have been billed to Allstate through the PC Defendants have been employees of the PC Defendants.

36.     Even so, the Clinic Defendants routinely submitted charges to Allstate and other insurers on behalf of the PC Defendants for Fraudulent Services that allegedly have been provided by technicians and by physicians other than Williams, Bley, Dublin, Alleyne, and Sharobeem.

37.     All of the Fraudulent Services other than the Fraudulent Services performed by Williams at Targee, Bley at Allmed, Dublin at Flatlands, Alleyne at MAMD, and Sharobeem at VAS were performed – to the extent that they were performed at all – by physicians and technicians whom the Clinic Defendants treated as independent contractors in an effort to avoid paying taxes, worker's compensation, and meeting other legal obligations. For instance, the Clinic Defendants:

> (i)     paid the physicians and technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;
>
> (ii)    established an understanding with the physicians and technicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the physicians and technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians and technicians;

(v)    failed to withhold federal, state or city taxes on behalf of the physicians and technicians;

(vi)    compelled the physicians and technicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted the physicians and technicians to set their own schedules and days on which they desired to perform services;

(viii)    permitted the physicians and technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the physicians and technicians for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians and technicians were independent contractors.

38.    For example, Tsirlin, who purported to perform EDX Tests at Targee and Flatlands, and another physician named Choong Kwon Kim, M.D. ("Kim"), who purported to perform EDX Tests at Allmed, Flatlands, MAMD and VAS: (i) provided their own equipment; (ii) set their own schedules and days on which they performed services; and, significantly, (iii) maintained non-exclusive relationships, and contemporaneously performed services for their own practices and on behalf of other medical practices that were in direct competition with one another. In fact, between 2007 and 2011, Tsirlin and Kim purported to provide services at more than 25 separate medical clinics in the New York metropolitan region. In addition to the PC

Defendants, the medical clinics from which the Tsirlin and Kim purportedly rendered services included, but were not limited to, the following:

| Clinic | Address | Purported Owner |
|---|---|---|
| Foster Comprehensive Medical, PC | 1414 Utica Ave., Brooklyn | Dr. Wilkins Williams |
| Avenue I Medical, PC | 1401 Ocean Ave., Brooklyn | Dr. Ricardo Galdamez |
| Bronx Mega Care Medical | 1862 East Tremont Ave., Bronx | Dr. Rafael Delacruz Gomez |
| Dr. Richard Medical, PC | 2511 Avenue I, Brooklyn | Dr. Ricardo Galdamez |
| Lifespan Medical, PC | 3858 Nostrand Avenue, Brooklyn | Dr. Hu-Nam Nam |
| South Bronx Medical, PC | 597-599 Southern Blvd., Bronx | Dr. Jose Martinez-Roura |
| R.R.D. Medical, P.C. | Brooklyn, New York | Dr. Ronald DiScenza |
| ARCO Medical, P.C. | 209-07 Jamaica Avenue, Queens | Dr. Richard Berardi |
| Jamaica Dedicated Medical Care, P.C. | 116-29 Sutphin Blvd., Queens | Dr. Viviane Etienne |
| Jamaica Medical Plaza, P.C. | 29 DeWitt Avenue, Staten Island | Dr. Billy Geris |
| S&R Medical, P.C. | 1115 Ocean Pkwy., Brooklyn | Dr. Yvette Davidov |
| AKO Medical, P.C. | 2174 Flatbush Ave., Brooklyn | Dr. Craig Nagourney |
| Ahava Medical, P.C. | 4253-2 Bronx Blvd., Bronx | Dr. Gracia Louis Mayard |
| Jamhil Medical, P.C. | 89-28 Merrick Blvd., Queens | Dr. Pervaiz Qureshi |
| Sebastian Medical, P.C. | 489 Brook Avenue, Bronx | Dr. Jason Shevetz |
| FMF Medical, P.C. | 15 North Mill Street, Nyack | Dr. Michael Fazio |

39.     By electing to treat the technicians and physicians other than Williams, Bley, Dublin, Alleyne, and Sharobeem as independent contractors, the Clinic Defendants realized significant economic benefits – for instance, they:

(i)      avoided the obligation to collect and remit the income tax owed by the physicians and technicians as required by 26 U.S.C. § 3102;

(ii)     avoided payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoided payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoided payment of workers' compensation insurance to cover the physicians and technicians as required by New York Workers' Compensation Law § 10;

(v)    avoided the need to secure any malpractice insurance to cover the physicians and technicians; and

(vi)    avoided claims of agency-based liability arising from the physicians' and technicians' work.

40.    In furtherance of the Defendants' fraudulent scheme, virtually every bill submitted through the PC Defendants to Allstate seeking payment for Fraudulent Services performed by physicians or technicians other than Williams, Bley, Dublin, Alleyne, and Sharobeem either: (i) misrepresented that the pertinent physician or technician was the relevant PC Defendant's employee; and/or (ii) failed to identify which physician or technician performed the services in a deliberate attempt to conceal the fact that the physicians or technicians who performed the services were independent contractors. (Representative examples of NF-3 forms submitted to Allstate by the Clinic Defendants are attached collectively as Exhibit "7").

41.    The Clinic Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants in order to make it appear as if the services were eligible for reimbursement, when in fact they were not. The Clinic Defendants' misrepresentations were consciously designed to mislead Allstate into believing that it was obligated to pay for the Fraudulent Services performed by physicians or technicians other than Williams, Bley, Dublin, Alleyne, and Sharobeem, when in fact Allstate was not.

**III.**    **Defendants' Fraudulent Treatment and Billing Scheme**

42.    The second part of the Defendants' fraudulent scheme involved the performance of medically useless services according to pre-determined, fraudulent

protocols. Each step in the fraudulent protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step. For instance:

    (i)    the Examinations were performed to provide a false basis for the ROM/Muscle Tests, Spirometry Tests, FCE Tests, TENS Sessions, and Consultations;

    (ii)    the Consultations, in turn, were performed to justify the Examinations, ROM/Muscle Tests, FCE Tests, and TENS Sessions, and to provide a false basis for the EDX Tests; and

    (iii)    the EDX Tests were performed and used to reinforce the purported "necessity" for additional ROM/Muscle Tests, as well as a laundry list of other medically unnecessary services.

43.    The Defendants created this fraudulent protocol solely to enrich themselves, without regard for the fact that it subjected patients to medically useless procedures.

**A.    <u>The Fraudulent Initial Examinations</u>**

44.    When an Insured arrived at one of the Clinic Defendants' offices, the Clinic Defendants almost always purported to provide the Insured with an initial Examination.

45.    The initial Examinations then were billed to Allstate separate and independent of the other Fraudulent Services. The charges for the initial Examinations typically were billed either under CPT code 99205 (generally resulting in a charge of $154.30, $182.18 or $236.94), 99245 (typically resulting in a charge of $230.09), or 99244 (generally resulting in a charge of $182.18 or $236.94).

46.    The charges for the initial Examinations were fraudulent in that they misrepresented the nature and extent of the initial Examinations.

47.     According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT codes 99205, 99245, and 99244 typically requires that the patient present with a problem of moderate-to-high severity. However, the Insureds who sought treatment and care from the Clinic Defendants had problems – to the extent that there are any – of low severity.

48.     Furthermore, the use of CPT code 99244 contemplates that the physician generally spends 60 minutes face-to-face with the patient and/or the patient's family, whereas CPT codes 99205 and 99245 contemplate that the physician generally spends 80 minutes face-to-face with the patient and/or the patient's family.  The use of CPT codes 99205, 99245, and 99244 in billing for the initial Examinations materially misrepresented and exaggerated the level of services provided by the Clinic Defendants, and were used solely to inflate the charges for each Examination.

49.     Though the Clinic Defendants routinely billed for the initial Examinations under CPT codes 99205, 99245, and 99244, no physicians associated with the Clinic Defendants ever spent 60 or 80 minutes on the initial Examinations. Rather, the initial Examinations rarely lasted more than 15 minutes, to the extent that they were conducted at all.

50.     In addition, when the Clinic Defendants submitted charges for the initial Examinations under CPT codes 99205 or 99245, they represented that they had: (i) taken a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

51.     Similarly, when the Clinic Defendants submitted charges for the initial Examinations under CPT code 99244, they represented that they had: (i) taken a

"comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

52.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of all body systems, not only the body systems that are related to the Insured's present complaint.

53.    Pursuant to the Fee Schedule, a "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the Insured.

54.    Though the Clinic Defendants routinely falsely represented that they had taken a "comprehensive" patient history from the Insureds during the initial Examinations, they almost never took a history of all of any Insured's body systems, and they almost never took a complete past, family, and social history from any Insured. To the extent that the Clinic Defendants took any patient history at all, it virtually always was limited to a request that the Insureds recount any major medical issues they had experienced, and the nature of the underlying automobile accident.

55.    Pursuant to the Fee Schedule, a "comprehensive" physical examination requires – among other things – that the healthcare provider either: (i) conduct a general examination of multiple patient organ systems; or (ii) conduct a complete examination of a single patient organ system.

56.    The Fee Schedule identifies the following organ systems: (i) eyes; (ii) ears, nose, mouth, and throat; (iii) cardiovascular; (iv) respiratory; (v) gastrointestinal; (vi) genitourinary; (vii) musculoskeletal; (viii) skin; (ix) neurologic; (x) psychiatric; and (xi) hematologic/lymphatic/immunologic.

57.     Though the Clinic Defendants routinely billed for the initial Examinations under CPT codes 99245, 99244, and 99205, and therefore falsely represented that they had conducted a "comprehensive" physical examination of Insureds during the initial Examinations, they almost never conducted a general examination of multiple organ systems, nor did they conduct a complete examination of a single organ system.

58.     Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

59.     Though the Clinic Defendants routinely falsely represented that their initial Examinations involved medical decision-making of "high complexity" (when billed under CPT codes 99205 or 99245) or "moderate complexity" (when billed under CPT code 99244), in actuality the initial consultations did not involve any medical decision-making at all.

60.     First, in virtually every case, the initial Examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Clinic Defendants for "treatment", they almost never arrived with any medical records. Furthermore, prior to the initial Examinations, the Clinic Defendants almost never requested any medical records from any other providers, nor conducted any diagnostic tests.

61.     Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Clinic Defendants, to the extent that the Clinic Defendants provided any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that the Clinic Defendants actually provided were limited to a series of medically unnecessary physical therapy modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

62.     Third, in virtually every case, the Clinic Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial Examinations. Rather, to the extent that the initial Examinations were conducted in the first instance, physicians associated with the Clinic Defendants made a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

63.     Specifically, in almost every instance, during the initial Examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

64.     Even so, following almost every initial Examination, regardless of their individual circumstances or unique presentment, the Insureds: (i) received a boilerplate diagnosis of "headache," "pain," and/or "sprain/strain"; (ii) were told to return to the Clinic Defendants several times per week for follow-up Examinations and a laundry-list

of medically unnecessary services, including the Fraudulent Services; and (iii) were referred to Tsirlin, Kim, or some other independent contractor for a Consultation.

**B.    The Fraudulent Follow-Up Examinations**

65.    In addition to the fraudulent initial examinations, the Clinic Defendants typically purported to subject Insureds to two or more fraudulent follow-up Examinations during the course of their fraudulent treatment protocol.

66.    The Clinic Defendants then virtually always billed the follow-up Examinations to Allstate either under CPT codes: (i) 99244, generally resulting in a charge of $182.18; (ii) 99215, generally resulting in a charge of $114.30; or (iii) 99214, generally resulting in a charge of $71.49.

67.    Like the Clinic Defendants' charges for the initial Examinations, their charges for the follow-up Examinations were fraudulent in that they misrepresented the nature and extent of the follow-up Examinations.

68.    According to the Fee Schedule, the use of CPT codes 99244, 99215 or 99214 typically requires that the Insured present with problems of moderate-to-high severity.

69.    Though the Clinic Defendants routinely billed for the follow-up Examinations under CPT codes 99244, 99215, or 99214, the Insureds almost never presented with problems of moderate-to-high severity. Rather, the Insureds almost never had any medical problems at all as the result of any automobile accident.

70.    Furthermore, the use of CPT code 99244 contemplates that the physician generally spends 60 minutes face-to-face with the patient and/or the patient's family. The use of CPT code 99215 typically requires that the physician spend 40 minutes of face-to-

face time with the Insured or the Insured's family. The use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

71.    Though the Clinic Defendants routinely billed for the follow-up Examinations using CPT codes 99244, 99215, or 99214, no physicians associated with the Clinic Defendants ever spent 60, 40, or even 25 minutes on the follow-up Examinations. Rather, the follow-up Examinations rarely lasted more than five minutes, to the extent that they were conducted at all.

72.    In addition, when the Clinic Defendants submitted charges for the follow-up Examinations under CPT code 99215, they falsely represented that they had performed at least two of the following three components: (i) taken a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

73.    When the Clinic Defendants submitted charges for the follow-up Examinations under CPT code 99244, they represented that they had: (i) taken a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

74.    Similarly, when the Clinic Defendants submitted charges for the follow-up Examinations under CPT code 99214, they falsely represented that they had performed at least two of the following three components: (i) taken a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

75.     However, during the purported follow-up Examinations, no physician associated with the PC Defendants took a "detailed", or "comprehensive" patient history.

76.     Furthermore, during the purported follow-up Examinations, no physician associated with the PC Defendants conducted a "detailed" or "comprehensive" patient examination.

77.     What is more, during the purported follow-up Examinations, no physician associated with the PC Defendants engaged in medical decision-making of moderate or high complexity.

78.     Instead, the Clinic Defendants simply cobbled together ersatz follow-up Examination reports for most Insureds, using pre-existing boilerplate – and, in many cases, pre-printed – language, to support the continuation of their fraudulent treatment and billing protocol.

### C.     The Fraudulent Unbundling of Initial and Follow-Up Examinations

79.     In many cases, Williams, Bley, Dublin, Allmed, Flatlands, and Targee fraudulently unbundled their charges for the initial and follow-up examinations, by submitting a separate charge of $157.17 under CPT code 99358 for "outcome assessment tests" provided contemporaneously with the initial and follow-up Examinations.

80.     The "outcome assessment tests" that Williams, Bley, Dublin, Allmed, Flatlands, and Targee purported to provide to Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing and the impact of those symptoms on their lives.

81.     Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up Examinations, and since the "outcome assessment tests" that Williams, Bley, Dublin, Allmed, Flatlands, and Targee purported to provide were nothing more than questionnaires regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" were to be reimbursed as an element of the initial Examinations and follow-up Examinations. In other words, healthcare providers cannot conduct and bill for an initial Examination or follow-up Examination, then bill separately for the type of contemporaneously-provided "outcome assessment tests" that Williams, Bley, Dublin, Allmed, Flatlands, and Targee purported to provide.

82.     The information gained through the use of the "outcome assessment tests" that Williams, Bley, Dublin, Allmed, Flatlands, and Targee purported to provide was not significantly different from the information that they purported to obtain during virtually every Insured's initial Examination and follow-up Examinations.

83.     Under the circumstances employed by Williams, Bley, Dublin, Allmed, Flatlands, and Targee, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during virtually every Insured's initial Examinations and follow-up Examinations. The "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Williams, Bley, Dublin, Allmed, Flatlands, and Targee.

84.     The use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided.

Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually has spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

85.     Though Williams, Bley, Dublin, Allmed, Flatlands, and Targee routinely submitted billing for the "outcome assessment tests" under CPT code 99358, they did not spend any time whatsoever reviewing or administering the tests, much less one hour.

### D.     The Fraudulent ROM/Muscle Tests

86.     In an attempt to maximize the fraudulent billing that they could submit or cause to be submitted for each Insured, following the initial Examinations and follow-up Examinations the Clinic Defendants instructed each Insured to return for one or more rounds of medically useless ROM/Muscle Tests.

### 1.     Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

87.     The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

88.     The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion."  Stated in a more illustrative

way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

89.     A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

90.     Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.   For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

91.     Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength are an essential component of the "hands-on" examination of a trauma patient. Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial Examination, as well as during any follow-up

24

Examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial Examinations and follow-up examinations. In other words, healthcare providers cannot conduct and bill for an initial Examination or follow-up Examination, then bill separately for contemporaneously-provided ROM/Muscle Tests.

### 2. The Clinic Defendants' Duplicate Billing for ROM/Muscle Tests

92. The Clinic Defendants purportedly conducted manual range of motion and muscle testing on each Insured during every initial Examination and follow-up Examination. The charges for these tests were part and parcel of the charges that the Clinic Defendants submitted for the initial Examinations under CPT codes 99245, 99244, and 99205, and for follow-up examinations under CPT codes 99244, 99215, and 99214.

93. Despite the fact that every Insured purportedly had undergone manual range of motion and muscle strength testing during their initial Examinations and follow-up Examinations, and despite the fact that reimbursement for the manual range of motion and muscle strength testing already had been paid by Allstate as a component of the initial Examination and/or follow-up Examinations, the Clinic Defendants systemically billed for, and purported to perform, a series of digital ROM/Muscle Tests on virtually every Insured.

94. Though the Insureds already visited the Clinic Defendants several times per week for Examinations, other Fraudulent Services, and physical therapy, the Clinic Defendants often deliberately scheduled separate appointments for ROM/Muscle Tests so that they could bill for those procedures separately, without having to include them in the billing for the Examinations, as required by the Fee Schedule.

95. The Clinic Defendants purported to conduct the range of motion component of the ROM/Muscle Tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that was performed during each initial Examination and follow-up Examination, except that a digital printout was obtained rather than the provider manually documenting the range of motion.

96. The Clinic Defendants purported to conduct the muscle strength component of the ROM/Muscle Tests by placing a strain gauge type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the range of motion component of the ROM/Muscle Tests, this muscle strength test was virtually identical to the manual muscle strength testing that is described above and that was performed during the initial Examinations and follow-up Examinations – except that a digital printout was obtained.

97. The information gained through the use of the ROM/Muscle Tests was not significantly different from the information obtained through the manual testing that was part and parcel of the initial Examination and follow-up Examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, to the extent that they sustained any injuries at all, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless. Indeed, this was evidenced by the fact that the Clinic Defendants almost never incorporated the results of the ROM/Muscle Tests into the rehabilitation programs of any of the Insureds that they purported to treat.

98.    While ROM/Muscle Tests can be a medically useful tool as part of a research project, under the circumstances employed by the Clinic Defendants it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing conducted during the initial Examinations and follow-up Examinations.   The ROM/Muscle Tests were rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Clinic Defendants.

**3.    The Clinic Defendants' Fraudulent Unbundling of ROM/Muscle Tests**

99.    Not only did the Clinic Defendants deliberately conduct duplicative, medically unnecessary ROM/Muscle Tests, they also unbundled the tests in order to maximize the fraudulent charges that they could submit to Allstate.

100.    This unbundling was accomplished one way at Allmed, Flatlands, Targee, and VAS, and another way at MAMD.

**(i)    Unbundling at Allmed, Flatlands, Targee, and VAS**

101.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

102.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code

97750, resulting in total charges of $91.42. If the provider performed 45 minutes of computerized range of motion and muscle testing, it would be permitted to submit three charges of $45.71 under CPT code 97750, resulting in total charges of $137.13, and so forth.

103.    Williams, Bley, Dublin, Sharobeem, Allmed, Flatlands, Targee, and VAS virtually always purported to provide computerized range of motion and muscle tests to Insureds on the same dates of service.

104.    To the extent that Williams, Bley, Dublin, Sharobeem, Allmed, Flatlands, Targee, and VAS actually provided the ROM/Muscle Tests to Insureds in the first instance, the ROM/Muscle Tests – together – almost never took more than 15 minutes to perform. Thus, even if the ROM/Muscle Tests that Williams, Bley, Dublin, Sharobeem, Allmed, Flatlands, Targee, and VAS purported to perform were medically necessary, and performed in the first instance, they would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

105.    In order to maximize their fraudulent billing for the ROM/Muscle Tests, Williams, Bley, Dublin, Sharobeem, Allmed, Flatlands, Targee, and VAS unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $45.71 under CPT code 95831 (for the muscle tests); and multiple charges of $43.60 under CPT code 95851 (for the range of motion tests).

106.    By unbundling what should – at most – have been single $45.71 charges under CPT code 97750 into multiple charges under CPT codes 95831 and 95851,

28

Williams, Bley, Dublin, Sharobeem, Allmed, Flatlands, Targee, and VAS generally submitted charges in excess of $300.00, and often submitted charges in excess of $600.00, for each round of computerized range of motion and muscle testing they purported to provide.

### (ii)    Unbundling at MAMD

107.    Alleyne and MAMD generally did not bill Allstate for computerized muscle testing, and instead focused on computerized range of motion testing, which they billed to Allstate as multiple charges of $43.60 under CPT code 95851 for each Insured, frequently resulting in charges exceeding $1,000.00 per Insured, per date of service.

108.    Though Alleyne and MAMD were not limited to the use of the time-based CPT code 97750, because they did not bill for computerized range of motion testing and computerized muscle testing on the same dates of service, their range of motion charges were fraudulently unbundled in the following manner:

(i)     Each bill misrepresented, using duplicate entries of CPT code 95851, that a large number of separate range of motion measurements were performed on each Insured and that, therefore, Alleyne and MAMD were entitled to bill Allstate $45.71 for each measurement, separate and independent from one another. In fact, only a handful of reimbursable measurements were performed on each Insured – to the extent that any measurements were performed at all.

(ii)    According to the Fee Schedule, a healthcare provider seeking reimbursement for range of motion measurements may only bill 5.41 units (i.e., $45.71) for each "extremity" or "trunk section" on which the measurements are taken. In actuality, the units identified as separately reimbursable on each MAMD bill were not separate extremity or trunk section measurements but, rather, were repeated measurements of the same extremity or trunk section. For example, rather than seeking reimbursement for $45.71 for the range of motion measurement of an Insured's cervical spine or lumbar spine (i.e., two sections of an Insured's "trunk"), each bill represented

that reimbursement of $45.71 was due for each measurement taken based upon the individual movement made by the Insured (i.e. cervical flexion and extension, lumbar rotation, etc.). Described another way, every time an Insured rotated his body in a different direction, or bent his/her elbow or knee, which took seconds, Alleyne and MAMD submitted a charge to Allstate for $45.71 per movement.

(ii)     Assuming that measurements of an Insured's trunk or extremities actually were performed by Alleyne and MAMD, the most that they were entitled to bill Allstate for the services rendered was $200.00 to $300.00 per Insured – to cover measurements of the trunk sections and the extremities. As a result of the misrepresentations made on the bills that were submitted to Allstate by Alleyne and MAMD, Alleyne and MAMD frequently defrauded Allstate into paying hundreds of additional dollars per Insured, often two-to-three times as much as they were entitled to be paid – to the extent that they were entitled to be paid for the duplicative computerized range of motion tests at all.

**4.      The Medically Implausible Results of the ROM/Muscle Tests**

109.    In addition to the fraudulent unbundling of the ROM/Muscle Tests, the results of the ROM/Muscle Tests were in many instances medically impossible, in that the test results, if accurate, would mean the Insureds on whom the tests were performed would either be too weak to support their own body weight, or, in the alternative, that they would be possessed of superhuman strength.

110.    For example, the Clinic Defendants routinely reported ROM/Muscle Test results for cervical extension strength indicating that the Insured on whom the test was performed would be unable to support the weight of his or her own head.

111.    The average human head weighs roughly eight pounds. In order to hold one's head erect and look straight ahead without assistance, cervical flexion strength must be in excess of eight pounds to support the weight of the average human head.

112. Nevertheless, the Clinic Defendants routinely reported ROM/Muscle Test results indicating that cervical flexion strength was well below eight pounds. If these test results were accurate, the Insured on whom the test was performed would be unable to hold his or her head upright. For instance:

(i) On July 7, 2009, Targee allegedly performed ROM/Muscle Testing on a patient named Patient "1" (Identity Redacted). The cervical flexion strength reported on the test results was only 3.7 pounds, which would render the patient unable to hold her head erect while in the standing position. In spite of the profound muscle weakness reported in the test results, there was no indication in this patient's file that she was unable to keep her head erect.

(ii) On October 27, 2009, Targee allegedly performed ROM/Muscle Testing on a patient named Patient "2" (Identity Redacted). The cervical flexion strength reported on the test results was only 4.6 pounds, which would render the patient unable to hold his head erect while in the standing position. In spite of the profound muscle weakness reported in the test results, there was no indication in this patient's file that he was unable to keep his head erect.

(iii) On June 4, 2008, Flatlands allegedly performed ROM/Muscle Testing on a patient named Patient "3" (Identity Redacted). The cervical flexion strength reported on the test results was only 7 pounds, which would render the patient unable to hold his head erect while in the standing position. In spite of the profound muscle weakness reported in the test results, there was no indication in this patient's file that he was unable to keep his head erect.

113. Furthermore, the Clinic Defendants routinely reported ROM/Muscle Test results indicating that the patient would be unable to stand up from a seated position. For example, the amount of knee extension force necessary to be able to stand from a chair with the assistance of hands is, on average, 50.1 pounds. But the Clinic Defendants often reported ROM/Muscle Test results well below this threshold, without any correlative presentment in the patient file. For instance, on February 14, 2008, VAS allegedly performed ROM/Muscle Testing on a patient named Patient "4" (Identity Redacted). The

combined knee extension force of the patient's right and left knees reported on the test results was only 17.3 pounds, which would render the patient unable to stand, even with the assistance of his hands. In spite of the profound muscle weakness reported in the test results, there was no indication in this patient's file that he was unable to stand from the seated position.

114.    In other instances, the ROM/Muscle Test results, if accurate, would mean that the patient on whom the test was performed was possessed of superhuman strength. For instance, Allmed submitted ROM/Muscle Test results indicating that the patients had cervical flexion strength between 844 and 7500 pounds and trunk extension strength between 2900 and 6500 pounds. These medically impossible results are not the result of mistaken computer data, because they were systematically reported by Allmed on many patients over the course of many months. For instance:

(i)     On July 23, 2008, Allmed allegedly performed ROM/Muscle Testing on a patient named Patient "5" (Identity Redacted). The cervical flexion strength reported on the test results was 4,300 pounds, which is well beyond the recognized physiological limits of the human body.

(ii)    On September 25, 2008, Allmed allegedly performed ROM/Muscle Testing on a patient named Patient "6" (Identity Redacted). The cervical flexion strength reported on the test results was 4,250 pounds, which is well beyond the recognized physiological limits of the human body.

(iii)   On December 18, 2008, Allmed allegedly performed ROM/Muscle Testing on a patient named Patient "7" (Identity Redacted). The cervical flexion strength reported on the test results was 2,980 pounds, which is well beyond the recognized physiological limits of the human body.

115.    The medically impossible nature of the ROM/Muscle Tests demonstrates that the Clinic Defendants either systematically misrepresented the results of the testing to

which their patients were subjected, or else misrepresented that the tests were conducted in the first instance.

### 5. The Clinic Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/Muscle Tests

116.    The Clinic Defendants' charges for the ROM/Muscle Tests also were fraudulent because they falsely represented that the Clinic Defendants prepared written reports interpreting the test data.

117.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851, the provider represents that it has prepared a written report interpreting the data obtained from the test.

118.    Likewise, pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized muscle testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

119.    Though the Clinic Defendants routinely submitted billing for the computerized range of motion and muscle tests using CPT codes 95851 and 95831, they almost never prepared any written report interpreting the data obtained from the tests.

120.    The Clinic Defendants almost never prepared any written report interpreting the data obtained from the tests because the tests were not meant to have any impact whatsoever on any Insured's course of treatment. Rather, the tests were provided – to the extent that they were provided at all – as part of the Clinic Defendants' pre-determined fraudulent treatment protocol, and were designed solely to financially enrich the Clinic Defendants at the expense of Allstate and other insurers, not to benefit the Insureds who supposedly were subjected to them.

### E.     The Fraudulent Spirometry Tests

121.     In addition to the other Fraudulent Services they purported to provide, Alleyne and MAMD purported to provide medically-unnecessary Spirometry Tests to many Insureds.

122.     Alleyne and MAMD then billed the Spirometry Tests to Allstate under CPT code 94070, typically resulting in charges of $228.65 for each round of Spirometry Tests that Alleyne and MAMD purported to provide.

123.     Spirometry, or breath measuring, tests are used to diagnose asthma, chronic obstructive pulmonary disease, and certain other conditions that affect breathing. Spirometry Tests also may be used periodically to check how well a patient's lungs are working once the patient has commenced treatment for a chronic lung condition.

124.     Spirometry Tests are conducted using a device called a spirometer, which measures the volume of air inspired and expired through a patient's lungs over a specified period.

125.     Though Alleyne and MAMD routinely purported to provide Spirometry Tests to Insureds, the tests were medically useless. Almost none of the Insureds who presented to MAMD for treatment and who purportedly received the Spirometry Tests had any pulmonary or respiratory complaints, much less any such complaints arising from the relatively minor automobile accidents they claimed to experience.

126.     Even so, Alleyne and MAMD routinely purported to provide the Spirometry Tests to Insureds as part of their fraudulent treatment and billing protocol, solely in order to maximize the fraudulent billing that they could submit to Allstate and

other insurers, rather than to benefit the Insureds who purportedly were subjected to the tests.

**F.      The Fraudulent Functional Capacity Evaluation Tests**

127.     In addition to other Fraudulent Services, Williams, Dublin, Targee, and Flatlands purported to provide FCE Tests to many Insureds.

**1.      Legitimate Uses and Requirements for FCE Testing**

128.     FCE Tests are a diagnostic test that assesses an individual's physical capacities and functional abilities by matching human performance levels to the demands of a specific occupation or work activity. FCE Tests establish the physical level of work an individual can perform and can be useful in determining job placement, job accommodation, or ability to return to work following an injury or illness. FCE Tests also can provide objective information regarding functional work ability for use in determination of an individual's occupational disability status.

129.     The Fee Schedule makes clear that FCE Tests only should be used to determine an individual's ability to assume or return to work. As the Fee Schedule states:

**Indications**

The FCE is utilized for the following purposes:

   A) To determine the level of safe maximal function at the time of maximal medical improvement.

   B) To provide a pre-vocational baseline of functional capabilities to assist in the vocational rehabilitation process.

   C) To objectively set restrictions and guidelines for return to work.

D) To determine whether specific job tasks can be safely performed by modification or technique, equipment or by further training.

E) To determine whether additional treatment or referral to a work hardening program is indicated.

F) To assess outcome at the conclusion of a work hardening program.

130.    The Fee Schedule also places certain limits on – among other things – who may perform an FCE Test, and the circumstances under which FCE Tests may be performed. Specifically, the Fee Schedule provides that:

(i)      FCE Tests only may be performed by: (a) a licensed physical therapist; (b) a licensed occupational therapist; or (c) another licensed healthcare provider qualified by his or her scope of practice, and constant supervision of the FCE Test by the licensed provider is required.

(ii)     FCE Tests only may be performed only at the point of maximal medical improvement in the opinion of the attending physician.

(iii)    FCE Tests may not be prescribed prior to three months post-injury unless there is a significant documented change in the status of the patient which justifies earlier utilization.

(iv)     FCE Tests only may be performed where the patient: (a) is preparing to return to a previous job; (b) has been offered a new job; or (c) is working with a rehabilitation provider and a vocational objective is established.

**2.      The Fraudulent FCE Tests**

131.    In order to maximize the fraudulent billing that they could submit, or cause to be submitted, Williams, Dublin, Targee, and Flatlands purported to provide FCE Tests to many Insureds, even though they knew that the FCE Tests were medically unnecessary and did not meet the Fee Schedule requirements.

132.    Targee and Williams billed the FCE Tests to Allstate under CPT codes 97800 or 97799, resulting in typical charges of between $495.00 and $500.00 for each round of FCE Tests they purported to provide.

133.    Dublin and Flatlands billed the FCE Tests to Allstate under CPT code 97750, resulting in typical charges of $249.96 for each round of FCE Tests they purported to provide.

**(i)      The FCE Tests Were Duplicative and Medically Unnecessary**

134.    Williams, Dublin, Targee, and Flatlands purported to provide FCE Tests to many Insureds despite their actual knowledge that the FCE Tests, to the extent that they were performed at all, were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that they purported to perform during every initial and follow-up Examination, and the ROM/Muscle Tests that they frequently purported to perform on intervening dates.

135.    Much like the duplicative ROM/Muscle Tests, the only substantive difference between the FCE Tests and the manual range of motion and manual muscle strength tests purportedly provided by Williams, Dublin, Targee, and Flatlands during every initial and follow-up Examination, is that the FCE Tests generated a digital printout of an Insured's range of motion and/or muscle strength.

136.    The range of motion and muscle strength data obtained through the use of the FCE Tests were not significantly different from the information obtained through the manual testing that was part and parcel of the initial Examination and follow-up

Examinations purportedly provided by Williams, Dublin, Targee, and Flatlands to most Insureds.

137.   Nor were the range of motion and muscle strength data obtained through the use of the FCE Tests significantly different from the data that Williams, Dublin, Targee, and Flatlands obtained through the ROM/Muscle Tests they purported to provide to Insureds.

138.   In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is meaningless. Indeed, this is evidenced by the fact that Williams, Dublin, Targee, and Flatlands virtually never incorporated the results of the FCE Tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

**(ii)   Performance of the FCE Tests by Unlicensed Technicians**

139.   Though the Fee Schedule requires that FCE Tests be performed by (i) a licensed physical therapist; (ii) a licensed occupational therapist; or (iii) another licensed healthcare provider qualified by his or her scope of practice, the FCE Tests allegedly performed through Targee and Flatlands were not performed by licensed healthcare providers of any type, to the extent that they were performed at all.

140.   Rather, the FCE Tests allegedly provided through Targee and Flatlands were performed – to the extent that they were performed at all – by unlicensed "technicians", who are not healthcare providers and who are not qualified to maintain any sort of healthcare practice.

141. The technicians who performed the FCE Tests that allegedly were provided through Targee and Flatlands were not supervised by Williams, Dublin, or any other licensed healthcare providers associated with Targee and Flatlands. Rather, they were simply directed to appear at Targee and Flatlands on designated dates, where they purported to perform the FCE Tests in the absence of Williams, Dublin, or any other licensed healthcare providers associated with Targee and Flatlands.

142. To conceal the fact that the FCE Tests were not performed by licensed healthcare providers, and therefore were unreimburseable under the Fee Schedule, Williams, Dublin, Targee, and Flatlands routinely falsely represented that a licensed physician was the "treating provider" with respect to the FCE Tests in the billing that they submitted, or caused to be submitted, to Allstate.

143. In addition, Williams, Dublin, Targee, and Flatlands deliberately omitted any reference to the technicians from the billing that they submitted, or caused to be submitted, to Allstate.

**(iii)    Performance of the FCE Tests Without Regard for Insureds' Vocational Status**

144. Although the Fee Schedule provides that FCE Tests only may be performed where the Insured: (i) is preparing to return to a previous job; (ii) has been offered a new job; or (iii) is working with a rehabilitation provider and a vocational objective is established, the FCE Tests allegedly provided through Targee and Flatlands were performed – to the extent that they were performed at all – without regard for the Insureds' vocational status.

145.    Specifically, in virtually every instance where FCE Tests purportedly were provided to Insureds through Targee and Flatlands, the Insureds either: (i) were unemployed at the time when the underlying automobile accidents occurred, and therefore had no "previous job" to return to; (ii) lost no time from work as the result of the underlying automobile accidents, and therefore had no "previous job" to return to; (iii) had not been offered any new employment; and/or (iv) had no "vocational objective" against which their functional capacity needed to be measured.

146.    To conceal the fact that the FCE Tests were performed without regard for Insureds' vocational status, and therefore were unreimburseable under the Fee Schedule, Williams, Dublin, Targee, and Flatlands routinely omitted any information regarding the Insureds' vocational status from the FCE Test reports that they submitted, or caused to be submitted, in support of their FCE Test billing.


**(iv)    Performance of FCE Tests Without Regard for Insureds' Medical Improvement**

147.    In keeping with the fact that FCE Tests are intended to determine an Insured's ability to commence or return to work, the Fee Schedule provides that FCE Tests only may be performed at the point of maximal medical improvement in the opinion of the attending physician.

148.    Because Insureds are unlikely to achieve maximal medical improvement immediately after their accidents, the Fee Schedule provides that FCE Tests should not be performed prior to three months post-injury unless there is a significant documented change in the status of the patient that justifies earlier utilization.

149.    Because an Insured only can achieve maximal medical improvement from a single accident on a single occasion, FCE Tests should be performed only once with respect to any given Insured following any single accident.

150.    Even so, Williams, Dublin, Targee, and Flatlands routinely purported to provide two FCE Tests to a single Insured following a single accident, with the first and – in many cases – the second such FCE Tests purportedly performed less than three months following the respective Insureds' accidents.

151.    Williams, Dublin, Targee, and Flatlands routinely purported to provide these FCE Tests without regard for any Insured's medical improvement.

152.    To conceal the fact that the FCE Tests were provided – to the extent that they were provided at all – without regard for Insureds' medical improvement, and therefore were unreimburseable under the Fee Schedule, Williams, Dublin, Targee, and Flatlands routinely omitted any information regarding the Insureds' recovery status from the FCE Test reports that they submitted, or caused to be submitted, in support of their billing.

**(v)     Concealment of the Nature of the FCE Tests**

153.    Because Williams, Dublin, Targee, and Flatlands were aware of the Fee Schedule restrictions on FCE Tests, and were aware that the FCE Tests they purported to provide were unreimburseable, in many cases they attempted to conceal the fact that the tests they purported to provide were FCE Tests.

154.    Pursuant to the Fee Schedule, the proper CPT code for an FCE Test is 97800.

155.    In an attempt to conceal the fact that they were purporting to provide FCE Tests, Williams, Dublin, Targee, and Flatlands in many cases submitted their charges for the FCE Tests under CPT codes 97750 (in the case of Dublin and Flatlands) or 97799 (in the case of Williams and Targee), rather than under CPT code 97800.

156.    CPT code 97750 is the code used for "physical performance" tests, rather than FCE Tests and – unlike FCE Tests – physical performance tests are not subject to the Fee Schedule utilization restrictions.

157.    CPT code 97799 is the code used for an "unlisted physical medicine/rehabilitation service or procedure" and – like CPT code 97750 – it is not subject to the Fee Schedule utilization restrictions.

158.    CPT code 97799 is a "by report" code, and therefore does not have a fixed, applicable charge. Pursuant to the Fee Schedule, a "by report" code is reserved for services that are "too variable in the nature of their performance to permit assignment" of a standard value.

159.    The use of CPT codes 97750 and 97799 to bill for the tests Williams, Dublin, Targee, and Flatlands purported to provide deliberately misrepresented the nature of the tests they purported to provide. In fact, the tests that Williams, Dublin, Targee, and Flatlands billed under CPT codes 97750 and 97799 were FCE Tests, and – like any FCE Tests – purported to measure the Insureds' functional capacity against vocational/occupational standards.

160.    Williams, Dublin, Targee, and Flatlands frequently billed for their FCE Tests under CPT codes 97750 and 97799 in a calculated attempt to conceal the fact that the tests were unreimburseable under the Fee Schedule.

(vi)     **Fraudulent Inflation of FCE Test Billing**

161.    In the cases where Dublin and Flatlands attempted to conceal the nature of their FCE Test billing by submitting it under CPT code 97750, they also fraudulently inflated their billing and misrepresented the extent of the services that they purported to provide.

162.    CPT code 97750 is a "per time" code, which in the metropolitan New York area permits a discrete charge of $45.71 for every 15 minutes that a provider spends on a test.

163.    In virtually every case in which Dublin and Flatlands submitted a bill for FCE Testing under CPT code 97750, they falsely stated that the FCE Tests took at least 90 minutes to perform, resulting in typical charges of $249.96 per test

164.    In actuality, the FCE Tests – to the extent that they were performed at all – never take more than 15 minutes to perform.

165.    Furthermore, when a healthcare provider submits a charge under CPT code 97750, it represents that it has prepared a written report interpreting the test results.

166.    In virtually every case in which Dublin and Flatlands submitted a bill for FCE Testing under CPT code 97750, they falsely represented that they prepared a written report interpreting the test results. In actuality, they virtually never prepared any written reports interpreting the test results, in keeping with the fact that the FCE Tests were not intended to have any impact whatsoever on any Insured's course of treatment.

G.      **The Fraudulent Transcutaneous Electrical Nerve Stimulation Sessions**

167.    In addition to other Fraudulent Services, Alleyne and MAMD purported to provide TENS Sessions to many Insureds.

168.    Alleyne and MAMD then billed the TENS Sessions to Allstate as multiple charges of $73.29 per Insured under CPT code 64550, typically resulting in thousands of dollars in charges for every Insured who supposedly was provided with the TENS Sessions.

169.    TENS Sessions involve the application of electrical current through the skin to provide patients with pain control. The electrical current is administered through the use of a device called a TENS unit.

170.    According to guidelines published by the American Medical Association, the use of CPT code 64550 is intended for the initial application of the TENS unit. The physician places electrodes from the TENS unit on the skin of the patient, instructs the patient on the proper use of the TENS unit, and the patient then takes the TENS unit home and operates it pursuant to the physician's instructions.

171.    The Office of the New York State Comptroller has noted that CPT code 64550 should not be billed multiple times for a single patient. A copy of the Comptroller's findings is annexed hereto as Exhibit "8".

172.    Likewise, the American Academy of Physical Medicine and Rehabilitation ("AAPMR") has concluded that recurrent therapy, provided in an office setting, should not be billed using CPT code 64550. See Exhibit "8".

173.    To the extent that Alleyne and MAMD provided any electrical stimulation treatments to Insureds in the first instance, the electrical stimulation treatments constituted physical therapy treatments under the Fee Schedule.

174.    Pursuant to the Fee Schedule, physical therapy treatments are billable at a much lower rate than TENS Sessions, and healthcare providers generally are limited to billing for eight units of physical therapy per date of service.

175.    Alleyne and MAMD deliberately misrepresented the electrical stimulation treatments they purported to provide as TENS Sessions in a calculated attempt to: (i) overcharge Allstate for the electrical stimulation treatments; and (ii) evade the unit-per-day limits on physical therapy that are imposed by the Fee Schedule.

176.    In fact, the TENS Sessions that Alleyne and MAMD purported to provide were medically unnecessary, and the treatments were provided – to the extent that they were provided at all – solely to financially enrich Alleyne and MAMD, not to benefit the Insureds who were subjected to them.

**H.    The Fraudulent Consultations**

177.    Based upon the fraudulent, pre-determined outcome of the Initial Examinations, the Clinic Defendants referred many Insureds for a Consultation with Tsirlin, Kim, or another independent contractor.  Typically, the Consultations were billed separately from the EDX Tests, though in some cases they were billed as part of the EDX Tests.

178.    Like the initial and follow-up Examinations, the Consultations were fraudulent inasmuch as they almost always were billed under billing code 99244 (typically resulting in charges of $182.18) or 99245 (typically resulting in charges of $230.00 or $230.09), yet – in virtually every case – neither Tsirlin, Kim, nor any other physician associated with the Clinic Defendants: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; (iii) engaged in medical

decision-making of "high complexity" or "moderate complexity"; or (iv) spent more than 15 minutes on the Consultations, to the extent that they were conducted in the first instance.

179.    This is because the outcomes were pre-determined – virtually every Insured who purportedly received a Consultation automatically was "diagnosed" with "derangement" or "sprain/strain" in their back. These diagnoses uniformly were arrived at by Tsirlin, Kim, and the other physicians who purported to provide the Consultations, and were rendered without regard for patient presentment, solely in order to maximize the amount of billing that the Clinic Defendants could submit for each Insured.

180.    Based upon these bogus diagnoses, Tsirlin, Kim and the other physicians who purported to provide the Consultations then arrived at the pre-determined "conclusion" that the Insureds required the EDX Tests to rule out cervical and/or lumbar radiculopathy.

181.    The Clinic Defendants required that Tsirlin, Kim and the other physicians who purported to provide the Consultations arrive at these pre-determined conclusions in order to fraudulently maximize the charges that could be submitted for each individual Insured. Tsirlin, Kim, and the other physicians who purported to provide the Consultations were part of and amenable to this scheme because of the financial remuneration provided by the Clinic Defendants.

## I.    The Fraudulent EDX Tests

182.    Based upon the pre-determined results of the Examinations and Consultations, Tsirlin, Kim, and the other physicians who purported to provide the Consultations purported to perform and interpret the EDX Tests for virtually every

Insured, namely electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs").

### 1.    The Human Nervous System and Electrodiagnostic Testing

183.    The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

184.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves.   They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.   A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

185.    EMGs and NCVs both are forms of electrodiagnostic tests, and purportedly are performed and interpreted by Tsirlin or other independent contractors affiliated with the Clinic Defendants because they allegedly are medically necessary to determine whether the Insureds have radiculopathies.

186.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. A copy of the Recommended Policy is annexed hereto as Exhibit "9". The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

187.    The pre-determined, uniform package of EDX Tests employed by Tsirlin and other independent contractors associated with the Clinic Defendants stands in marked contrast to the Recommended Policy in several major respects. For instance, the Recommended Policy states that the maximum number of NCVs and EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; (iii) two H-reflex studies; and (iv) EMGs of two limbs. However, in an attempt to extract the maximum amount of billing out of each Insured, and at the insistence of the pertinent Clinic Defendants:

>    (i)    at Targee and Flatlands, Tsirlin generally performed: (a) EMGs of four limbs; (b) NCVs of eight motor nerves, frequently comprised of two separate motor nerve NCVs of four motor nerves, each; and (c) NCVs of eight sensory nerves, frequently comprised of two separate motor nerve NCVs of four motor nerves, each.

>    (iii)    at Allmed, Flatlands, MAMD and VAS, Kim generally performed: (a) EMGs of four limbs; (b) NCVs of eight motor nerves, comprised of two separate motor nerve NCVs of four motor

nerves, each; and (c) NCVs of 10 sensory nerves, comprised of two separate sensory nerve NCVs, one of six sensory nerves and the other of four sensory nerves.

188.    Furthermore, though the Recommended Policy appropriately recognizes that NCVs and EMGs have demonstrated usefulness in diagnosing radiculopathies, it explains that the decision of which, if any, of the electrodiagnostic tests to perform should be individually tailored to address the unique circumstances of each patient. However, the Defendants; pre-determined package of EDX Tests did not address the unique circumstances of each patient. Rather, virtually every Insured received the same EDX Tests on the same nerves.

189.    The Defendants' pre-determined package of Consultations and EDX Tests was conducted solely for the purpose of enabling the Clinic Defendants to submit large-scale, fraudulent charges to Allstate and other insurers through the PC Defendants. These charges typically included:

| CPT Code | Service | Charge |
|---|---|---|
| 99244/99245 | 60/80 minute office consultation for new or established patient. | $182.18/$230.09 |
| 95864/95861 | Four extremity EMG with paraspinal areas/ two separate two extremity EMGs with paraspinal areas | $408.64/$483.00 |
| 95903 | Four upper motor nerve NCV study – with F wave study | $665.88 |
| 95903 | Four lower motor nerve NCV study – with F wave study | $665.88 |
| 95904 | Four/six upper sensory nerve NCV study | $425.88/$638.82 |
| 95904 | Four lower sensory nerve NCV study | $425.88 |
| 95934 | Two lower nerve H-reflex study | $239.98 |
| | **TOTAL:** | **$3,014.32 - $3,349.53** |

190.    In a significant percentage of Insureds, the charges submitted by or through the Clinic Defendants were increased by an order of magnitude because, as discussed herein, the Defendants routinely unbundled the NCV and EMG charges. Accordingly, the Clinic Defendants frequently submitted bills for fraudulent EDX Test charges to Allstate that accrued up to $3,600.00 per Insured.

**2.    The Fraudulent NCVs**

191.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is measured and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity"). In addition, the EMG machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

192.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

193.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and

then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

194.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCVs are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCVs should vary from patient-to-patient. Likewise, the decision regarding whether to conduct F-wave or H-reflex studies should vary from patient-to-patient according to the individual patient's clinical presentation and the evolving electrodiagnostic study results.

195.    The Defendants did not tailor the NCVs that they performed or purported to provide to the unique circumstances of each individual Insured. Instead, they applied a fraudulent protocol and purported to perform or provide NCVs on the same peripheral nerves and nerve fibers for virtually every Insured who received NCVs. Specifically, the Defendants purported to test the following peripheral nerves and nerve fibers on almost every Insured: (i) left and right median motor nerves; (ii) left and right peroneal motor nerves; (iii) left and right tibial motor nerves; (iv) left and right ulnar motor nerves; (v) left and right median sensory nerves; (vi) left and right radial sensory nerves; (vii) left and right superficial peroneal sensory nerves; (viii) left and right sural sensory nerves; and (ix) left and right ulnar sensory nerves.

196.    The Defendants' cookie-cutter approach to the NCVs that they performed or provided to virtually every Insured clearly was not based on medical necessity. Instead, the Defendants' cookie-cutter approach to the NCVs was designed solely to maximize the charges that the Clinic Defendants could submit to Allstate and other insurers, to maximize ill-gotten profits for the Clinic Defendants, and – in Tsirlin's case – to ensure that the Clinic Defendants continued to use his services as independent contractors.

197.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals to submit maximum charges of: (i) $106.47 for each sensory nerve in any limb on which an NCV is performed; (ii) $166.47 for each motor nerve in any limb on which an NCV is performed; and (iii) $119.99 for each H-Reflex test that is performed on the nerves of any limb. The Defendants routinely purported to test far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to Allstate and other insurers.

198.    In addition, the values and waveforms contained in the NCV reports that have been attested to by the Defendants and submitted to Allstate through the Clinic Defendants in support of their billing could not possibly be valid.  NCV test results are contained in reports that display numeric values for each category of nerve measurements that are taken during an NCV test – i.e., conduction velocity, amplitude, latency, etc. The NCV reports also contain graphic waveforms, from which the numeric values for each category of nerve measurements are derived. Each waveform and numeric value is specific to a given nerve's electrical characteristics at the moment the measurement is taken.

199.   Each waveform is unique. Even if the same nerve, on the same person, was retested moments later, the resulting waveforms and data would be somewhat different. In order for the waveforms and data from two different NCV studies to be identical, the electrical currents measured at the recording electrodes affixed to each different patient would have to be identical to the microsecond for the entire duration of the test. It is impossible for this to occur even a single time. Therefore, the set of values and waveforms for each nerve values that are reported in NCV reports represent the unique "fingerprints" of an Insured's nerves under specific conditions at a specific moment in time.

200.   To further defraud Allstate, the Defendants routinely created and submitted NCV reports containing waveforms and numerical data that were duplicated across several patients. Essentially, the Defendants fabricated phony NCV test results by copying the data from a pre-existing NCV report, then pasting it into NCV reports created for new patients.  Then, they billed Allstate for these fabricated, phony NCVs, sending the ersatz NCV reports to Allstate as: (i) evidence that Tsirlin, Kim, or some other independent contractor performed the tests; and (ii) a representation of the Insureds' medical conditions. Accordingly, each report misrepresented, among other things: (i) that the transmitted NCV test results display the results of the Insureds' tests; and (ii) that the purported findings were true representations of the Insureds' respective conditions.

201.   Allstate commissioned a review of the Defendants' NCV submissions by Randall L. Braddom, M.D., M.S., ("Dr. Braddom"), an expert on electrodiagnostic testing. Dr. Braddom determined that, in support of their billing, the Defendants repeatedly submitted identical NCV waveforms and data for different patients, a medical

impossibility that conclusively demonstrates fraud. For example, the Braddom Report

identified the following Match Groups:

(i) <u>Match Group One</u> – Kim purportedly performed NCVs on a patient named Patient "8" (Identity Redacted) at Allmed on August 12, 2008. After reviewing the NCV reports that Allmed submitted in support of its billing, Dr. Braddom determined that there was complete duplication of the left median, right median, left ulnar and right ulnar motor nerves, and complete duplication of the left median, right median, left radial, right radial, left ulnar and right ulnar sensory nerves between Patient "8" and (i) a patient named Patient "9" (Identity Redacted), on whom Tsirlin purportedly performed NCVs at Jamaica Medical Plaza, P.C., on January 8, 2008; (ii) a patient named Patient "10" (Identity Redacted), on whom Kim purportedly performed NCVs at Jamaica Dedicated Medical, P.C. on October 17, 2007; (iii) a patient named Patient "11" (Identity Redacted), on whom Kim purportedly performed NCVs at ARCO Medical, P.C. on September 5, 2008; (iv) a patient named Patient "12" (Identity Redacted), on whom Kim purportedly performed NCVs at Ahava Medical, P.C. on February 6, 2008; and (v) a patient named Patient "13" (Identity Redacted), on whom Kim purportedly performed NCVs at South Bronx Medical, P.C. on October 23, 2008. In addition to these matches, Dr. Braddom identified NCV match data from Patient "8" among over 60 other patients for whom test results were submitted for billing to Allstate from various providers in the New York metropolitan area, including Defendants Flatlands and VAS.

(ii) <u>Match Group Two</u> – Tsirlin purportedly performed NCVs on a patient named Patient "14" (Identity Redacted) at Flatlands on June 9, 2008. After reviewing the NCV reports that Flatlands submitted in support of its billing, Dr. Braddom determined that there was complete duplication of the right median, left ulnar and right ulnar motor nerves, and complete duplication of the left median, right median, left radial, right radial, left ulnar and right ulnar sensory nerves between Patient "14" and (i) a patient named Patient "15" (Identity Redacted), on whom Kim purportedly performed NCVs at Arco Medical, P.C., on December 1, 2008; (ii) a patient named Patient "16" (Identity Redacted), on whom Kim purportedly performed NCVs at Ahava Medical, P.C. on October 23, 2007; and (iii) a patient named Patient "17" (Identity Redacted), on whom Kim purportedly performed NCVs at Ahava Medical, P.C. on January 15, 2008. In addition to these matches, Dr. Braddom identified NCV match data from Patient "14" among at least 10

other patients for whom test results were submitted for billing to Allstate from various providers in the New York metropolitan area.

(iii)  Match Group Three – Kim purportedly performed NCVs on a patient named Patient "18" (Identity Redacted) at VAS on March 26, 2008. After reviewing the NCV reports that VAS submitted in support of its billing, Dr. Braddom determined that there was complete duplication of the left peroneal, right peroneal, left sural and right sural sensory nerves between Patient "18" and (i) a patient named Patient "19" (Identity Redacted), on whom Kim purportedly performed NCVs at MAMD, on October 22, 2008; (ii) a patient named Patient "20" (Identity Redacted), on whom Kim purportedly performed NCVs at Lifespan Medical, P.C. on July 25, 2008; (iii) a patient named Patient "21" (Identity Redacted), on whom Kim purportedly performed NCVs at Jamhil Medical, P.C. on April 13, 2007; (iv) a patient named Patient "22" (Identity Redacted), on whom Kim purportedly performed NCVs at Flatlands on July 22, 2008; (v) a patient named Patient "23" (Identity Redacted), on whom Kim purportedly performed NCVs at an unidentified provider on September 10, 2008; and (vi) a patient named Patient "24" (Identity Redacted), on whom Kim purportedly performed NCVs at Jamaica Dedicated Medical, P.C. on March 20, 2008. In addition to these matches, Dr. Braddom identified NCV match data from Patient "18" among over 10 other patients for whom test results were submitted for billing to Allstate from various providers in the New York metropolitan area.

(iv)  Match Group Four – Kim purportedly performed NCVs on a patient named Patient "25" (Identity Redacted) at MAMD on January 14, 2009. After reviewing the NCV reports that MAMD submitted in support of its billing, Dr. Braddom determined that there was complete duplication of the left peroneal, right peroneal, left sural and right sural sensory nerves between Patient "25" and (i) a patient named Patient "26" (Identity Redacted), on whom Kim purportedly performed NCVs at Doctor Richard Medical, P.C., on November 12, 2007; (ii) a patient named Patient "27" (Identity Redacted), on whom Kim purportedly performed NCVs at ARCO Medical, P.C. on November 30, 2007; (iii) a patient named Patient "28" (Identity Redacted), on whom Kim purportedly performed NCVs at Lifespan Medical, P.C. on July 25, 2008; (iv) a patient named Patient "29" (Identity Redacted), on whom Kim purportedly performed NCVs at ARCO Medical, P.C. on January 9, 2009; (v) a patient named Patient "30 (Identity Redacted), on whom Kim purportedly performed NCVs at Jamhil Medical, P.C. on April 13, 2007; (vi) a patient named Patient "31" (Identity Redacted), on

whom Kim purportedly performed NCVs at Jamaica Dedicated Medical, P.C. on June 13, 2007; (vii) a patient named Patient "32" (Identity Redacted), on whom Kim purportedly performed NCVs at Sebastian Medical, P.C. on February 21, 2007; and (viii) a patient named Patient "33" (Identity Redacted), on whom Kim purportedly performed NCVs at Medical Polis, P.C. on February 7, 2008. In addition to these matches, Dr. Braddom identified NCV match data from Patient "25" among over 10 other patients for whom test results were submitted for billing to Allstate from various providers in the New York metropolitan area.

(v)    Match Group Five – Tsirlin purportedly performed NCVs on a patient named Patient "34" (Identity Redacted) at Targee on April 27, 2009. After reviewing the NCV reports that Targee submitted in support of its billing, Dr. Braddom determined that there was complete duplication of the left median, right median, left ulnar and right ulnar motor nerves, and complete duplication of the left median, right median, left radial, right radial, left ulnar and right ulnar sensory nerves between Patient "34" and (i) a patient named Patient "35" (Identity Redacted), on whom Kim purportedly performed NCVs at Medical Polis, P.C., on July 14, 2008; and (ii) a patient named Patient "36" (Identity Redacted), on whom Kim purportedly performed NCVs at Foster Medical Group, P.C. on April 23, 2007. In addition to these matches, Dr. Braddom identified NCV match data from Patient "34"'s left ulnar motor nerve among over 15 other patients for whom test results were submitted for billing to Allstate from various providers in the New York metropolitan area.

202.    Not only were there duplicated NCV reports within the various Match Groups, but certain data were duplicated across several Match Groups. For instance, the NCV reports submitted for every patient in Match Group Three contained matching data for the left peroneal, right peroneal, left sural and right sural sensory nerve for every patient in Match Group Four. Among the various Match Groups identified above (and the hundreds of other matches not specifically mentioned herein, but confirmed by Dr. Braddom's study), there are hundreds of other instances demonstrating that the

Defendants regularly constructed fraudulent NCV reports by cutting and pasting data from pre-existing NCVs.

203.    The hundreds of matches, in addition to the clearly identifiable Match Groups described above, confirm that the Defendants drew from a "stock" of NCV data and waveform images that they randomly assemble and combine with the Insureds' claim information to create the impression that the NCV reports represent valid test results.

### 3.    The Fraudulent EMGs

204.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

205.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

206.    The Defendants did not tailor the performance of EMGs to the unique circumstances of each Insured. Instead, they routinely purported to provide EMGs on the same muscles in the same limbs over and over again, without regard for individual patient presentment.

207.    Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that the Defendants generally purported to provide grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. Typically, the Defendants purported to provide four-limb EMGs, in contravention of the Recommended Policy.

208.    The Defendants' cookie-cutter approach to the EMGs that they purported to perform or provide to virtually every Insured clearly was not tailored to the unique circumstances of any Insured and was not based upon medical necessity.  Rather, the Defendants' cookie-cutter approach to the EMGs was designed solely to maximize the charges that the Clinic Defendants could submit to Allstate and other insurers.

209.    More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs. The Defendants routinely purported to provide four-limb EMGs to Insureds solely to maximize the profits that the Clinic Defendants could reap from each such Insured, and – in Tsirlin's case – to ensure that the Clinic Defendants continued to use his services as an independent contractor.

58

210.   Not only did the Defendants routinely purport to provide four-limb EMGs to Insureds, in many cases they unbundled their billing into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG charge of $408.64, in order to maximize their fraudulent EMG billing and conceal the fact that they were providing four-limb EMGs to Insureds in contravention of the Recommended Policy.

211.   Allstate commissioned a review by Dr. Braddom of EMG submissions made by the Defendants.   Among other things, Dr. Braddom reached the following conclusions regarding the EMG reports prepared and submitted by the Defendants:

(i)   The Defendants routinely tested the same groups of muscles in the same limbs over and over again, to an extent that exceeds any statistical likelihood that the individual patients had presented with symptoms that required such identical EMG testing;

(ii)   In a majority of cases, the Defendants conducted incomplete EMGs, which nonetheless were billed to Allstate. In order to submit a charge to Allstate or other insurers, the Defendants were required to test at least five muscles per extremity for each Insured. Even so, the Defendants typically tested only three to four muscles per extremity.

(iii)   Under the most liberal interpretation, radiculopathies are present in only 12 percent of motor vehicle accident victims. The Defendants, however, purported to diagnose radiculopathies in upwards of 60 percent of Insureds. The Defendants arrived at these pre-determined "conclusions" in order to create the appearance of severe injuries and thereby provide support for the laundry-list of medically unnecessary services provided through the Clinic Defendants.

(iv)   Though multiple levels of radiculopathy are present in only approximately 20 percent of cases in which a patient legitimately suffers from radiculopathy, Defendants purported to identify multiple levels of radiculopathy in a disproportionately high number of Insureds who received a radiculopathy diagnosis. Again, Defendants arrived at these pre-determined "conclusions" in order to create the appearance of severe injuries and thereby provide

59

support for the laundry-list of medically unnecessary services provided through the Clinic Defendants.

(v)    Furthermore, in diagnosing radiculopathy, electromyographers use changes in muscle electrical activity observed on EMG needle examinations. Typically, motor unit recruitment in limb muscles is one of the earliest observed changes. Recruitment cannot reasonably be determined in the paraspinal muscles. However, in upwards of 80% of the EMGs that they purported to provide, the Defendants reported that they read recruitment in the paraspinal muscles.

(vi)   Though 50-80 percent of patients who legitimately suffer from cervical radiculopathy present with a radiculopathy at the C7 root level, not a single one of the cervical radiculopathy "diagnoses" made by the Defendants was identified as a C7 radiculopathy.

(vii)  Though between 76 and 90 percent of patients who legitimately suffer from lumbosacral radiculopathy present with a radiculopathy at either the L5 or S1 root level, only between 0 and 25 percent of the EDX Testing Defendants' lumbosacral radiculopathy "diagnoses" identified an L5 or S1 radiculopathy.

(viii) Though only 18 percent of patients who legitimately suffer from cervical radiculopathy present with a radiculopathy at either the C56 or C67 root level, 100 percent of the radiculopathy "diagnoses" for Flatlands, MAMD and VAS identified a C56 or C67 radiculopathy.

212.   Additionally, the Defendants typically performed no genuine, independent analysis of the EMG testing results at all. Instead, they simply used the "diagnoses" from their EMG "findings" to justify a laundry list of medically useless procedures that included, but were not limited to, the Fraudulent Services.

**J.    The Defendants Subjected Minors to Their Fraudulent Treatment Protocol**

213.   In many cases, not even the youngest patients were spared the Defendants' fraudulent treatment protocol. Rather, to extract the maximum possible billing from each Insured, the Defendants even subjected minors to their full range of phony "treatments."

214.    Because the Defendants' cookie-cutter approach to medical care was uniform for virtually every Insured, it placed virtually every Insured at risk of going untreated in the event that the patient actually presented with a genuine medical problem. Likewise, since in many cases the Defendants simply cobbled together EDX Test reports using preexisting data from other patients, it placed patients at risk of going untreated in the event that the patient actually presented with a genuine medical problem. Because the Defendants applied their fraudulent treatment protocol to minors as well as adults, they placed minors at serious risk. For instance:

(i)     Over the course of several months in 2008, Bley subjected a 10 year-old girl named Patient "37" (Identity Redacted) to the full fraudulent treatment protocol at Allmed, without regard for any actual medical problems that she may have had. While she was not included in any of the Match Groups noted above, the NCV report prepared for Patient "37" contained data that were an exact match to data that appeared in other NCV reports for 69 other patients at various providers in the New York metropolitan area -- including Defendants Allmed, Flatlands and VAS -- a medical impossibility which indicates that the NCV never was performed at all.

(ii)    Over the course of several months in 2008, Bley subjected a 15 year-old girl named Patient "38" (Identity Redacted) to the full fraudulent treatment protocol at Allmed, without regard for any actual medical problems that she may have had. While she was not included in any of the Match Groups noted above, the NCV report prepared for Patient "38" contained data that were an exact match to data that appeared in other NCV reports for over 50 other patients at various providers in the New York metropolitan area -- including Defendants Allmed and Flatlands -- a medical impossibility which indicates that the NCV never was performed at all.

(iii)   Over the course of several months in 2009, Dublin subjected a 17 year-old girl named Patient "39" (Identity Redacted) to the full fraudulent treatment protocol at Flatlands. While she was not included in any of the Match Groups noted above, the NCV report prepared for Patient "39" contained data that were an exact match to data that appeared in other NCV reports for over 10 other

patients at various providers in the New York metropolitan area -- including Defendant Flatlands -- a medical impossibility which indicates that the NCV never was performed at all.

## IV.   The Fraudulent NF-3/HCFA-1500 Forms Submitted to Allstate

215.   To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 and HCFA-1500 forms) consistently have been submitted to Allstate by and on behalf of the Defendants seeking payment for Fraudulent Services for which the Defendants are ineligible to receive payment.

216.   The NF-3 and HCFA-1500 forms submitted to Allstate by and on behalf of the Defendants are false and misleading in the following material respects:

(i)     The NF-3 and HCFA-1500 forms submitted by and on behalf of the Defendants uniformly misrepresented to Allstate that the Fraudulent Services were medically necessary, and in many cases misrepresent that the Fraudulent Services were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants.

(ii)    The NF-3 and HCFA-1500 forms submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of service and the nature of the service that purportedly was provided.

(iii)   With the exception of NF-3 forms and HCFA-1500 forms covering Fraudulent Services allegedly performed by Williams at Targee, Bley at Allmed, Dublin at Flatlands, Alleyne at MAMD, and Sharobeem at VAS, the NF-3 forms and HCFA-1500 forms uniformly misrepresented to Allstate that the PC Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that allegedly were performed. In fact, the PC Defendants were not eligible to seek or pursue collection of No-Fault Benefits associated with services other than services allegedly performed by Williams at Targee, Bley at Allmed, Dublin at Flatlands, Alleyne at MAMD, and

Sharobeem at VAS, because the services were not provided by the PC Defendants' employees.

## V.    The Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance

217.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the performance of the Fraudulent Services and their submission of charges to Allstate.

218.   To induce Allstate to promptly pay the charges for the Fraudulent Services, the Defendants went to great lengths to systematically conceal their fraud. For instance, they knowingly misrepresented and concealed facts related to the employment status of the physicians and technicians associated with the PC Defendants in order to prevent Allstate from discovering that the physicians and technicians performing the Fraudulent Services were not employed by the PC Defendants.

219.   In addition, they knowingly misrepresented and concealed facts in order to prevent Allstate from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, rather than to benefit the Insureds that were subjected to them.

220.   Moreover, they knowingly misrepresented and concealed facts in order to prevent Allstate from discovering that, in many cases, the Fraudulent Services never were performed in the first instance.

221.   The Defendants have hired law firms to pursue collection of the fraudulent charges from Allstate and other insurers. These law firms routinely file expensive and time-consuming litigation against Allstate and other insurers if the charges are not promptly paid in full.

222.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause Allstate to rely upon them. As a result, Allstate has incurred damages of more than $1,270,000.00 based upon the fraudulent charges.

223.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Allstate, Allstate did not discover, and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## VI.    Allstate's Timely Denial and Requests for Additional Verification of the Defendants' Pending No-Fault Claims

224.    Allstate maintains standard office practices and procedures that are designed to and do ensure that no-fault claims denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

225.    In accordance with the No-Fault Laws, and Allstate's standard office practices and procedures, Allstate either: (i) timely denied the pending claims for No-Fault Benefits submitted through the PC Defendants; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the PC Defendants, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through the PC Defendants, or else to request additional verification of those claims, has not expired.

## FIRST CAUSE OF ACTION AGAINST THE PC DEFENDANTS
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

226.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 225 above.

227.    There is an actual case in controversy between Allstate and the PC Defendants as to more than $887,000.00 in pending fraudulent charges for the Fraudulent Services that have not been paid.

228.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate for the Fraudulent Services because the Fraudulent Services were not medically necessary and in many cases were not performed in the first instance.

229.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate for the Fraudulent Services because the Fraudulent Services were ordered and performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants.

230.    To the extent that the Fraudulent Services were performed by technicians or physicians other than Williams at Targee, Bley at Allmed, Dublin at Flatlands, Alleyne at MAMD, and Sharobeem at VAS, the PC Defendants have no right to receive payment for any pending bills submitted to Allstate for the Fraudulent Services because the Fraudulent Services were not performed by the PC Defendants' employees.

231.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

    (i)    the PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were provided by independent contractors;

(ii)    the PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were not medically necessary or were not provided at all; and

(iii)    the PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were ordered and performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants.

**SECOND CAUSE OF ACTION**
**AGAINST WILLIAMS**
(Violation of 18 U.S.C. § 1962(c))

232.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 231 above.

233.    Targee Medical Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

234.    Williams knowingly has conducted and/or participated, directly or indirectly, in the conduct of Targee's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that Targee was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by Targee employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate

that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

235.    Targee's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Williams operates Targee, insofar as Targee is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Targee to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the the Defendants continue to attempt collection on the fraudulent billing submitted through Targee to the present day.

236.    Targee is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Targee in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

237.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $463,000.00 pursuant to the fraudulent bills submitted through Targee.

238.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### AGAINST WILLIAMS AND TSIRLIN
(Violation of 18 U.S.C. § 1962(d))

239.    Allstate incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 238 above.

240.     Targee Medical Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

241.     Williams and Tsirlin are employed by and/or associated with the Targee enterprise.

242.     Williams and Tsirlin knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Targee enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than three years seeking payments that Targee was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by Targee employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

243.     Williams and Tsirlin knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

244.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $463,000.00 pursuant to the fraudulent bills submitted through Targee.

245.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
### AGAINST TARGEE AND WILLIAMS
(Common Law Fraud)

246.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 245 above.

247.    Targee and Williams intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

248.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iii) in every claim for services provided by anyone other than Williams, the representation that the services were performed by Targee's employees, when in fact they were not.

249.    Targee and Williams made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

250.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $463,000.00 based upon the fraudulent charges.

251.    Targee's and Williams' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

252.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**AGAINST TSIRLIN**
(Aiding and Abetting)

253.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 252 above.

254.    Tsirlin knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Williams and Targee. The acts of Tsirlin in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money from Williams and Targee; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Williams and Targee.

255.    The conduct of Tsirlin in furtherance of the fraudulent scheme is significant and material. The conduct of Tsirlin is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the

issuance of the fraudulent EDX Testing reports, there would be no opportunity for Williams and Targee to obtain payment from Allstate and from other insurers.

256.   Tsirlin aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Targee for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

257.   The conduct of Tsirlin caused Allstate to pay more than $463,000.00 based upon the fraudulent charges submitted through Targee.

258.   Tsirlin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

259.   Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
### AGAINST TARGEE, WILLIAMS, AND TSIRLIN
(Unjust Enrichment)

260.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above.

261.   As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

262.   When Allstate paid the bills and charges submitted by or on behalf of Targee for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

263.     Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

264.     Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

265.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $463,000.00.

**SEVENTH CAUSE OF ACTION**
**AGAINST BLEY**
(Violation of 18 U.S.C. § 1962(c))

266.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 265 above.

267.     Allmed Medical of Williamsburg, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

268.     Bley knowingly has conducted and/or participated, directly or indirectly, in the conduct of Targee's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over 21 months seeking payments that Allmed was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by Allmed employees, and in many cases were not performed at all. A

representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

269.    Allmed's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bley operates Allmed, insofar as Allmed is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Allmed to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the the Defendants continue to attempt collection on the fraudulent billing submitted through Allmed to the present day.

270.    Allmed is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Allmed in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

271.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $249,000.00 pursuant to the fraudulent bills submitted through Allmed.

272.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
### AGAINST ALLMED AND BLEY
(Common Law Fraud)

273.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 272 above.

274.    Allmed and Bley intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

275.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iii) in every claim for services provided by anyone other than Bley, the representation that the services were performed by Allmed's employees, when in fact they were not.

276.    Allmed and Bley made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

277.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $249,000.00 based upon the fraudulent charges.

278.    Allmed's and Bley's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

279.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### AGAINST ALLMED AND BLEY
(Unjust Enrichment)

280.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 279 above.

281.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

282.    When Allstate paid the bills and charges submitted by or on behalf of Allmed for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

283.    Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

284.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

285.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $249,000.00.

### TENTH CAUSE OF ACTION
### AGAINST DUBLIN
(Violation of 18 U.S.C. § 1962(c))

286.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 285 above.

287.   Flatlands Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

288.   Dublin knowingly has conducted and/or participated, directly or indirectly, in the conduct of Flatlands' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over 22 months seeking payments that Flatlands was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by Flatlands employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

289.   Flatlands' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dublin operates Flatlands, insofar as Flatlands is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Flatlands to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the the Defendants continue to attempt collection on the fraudulent billing submitted through Flatlands to the present day.

290.    Flatlands is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Flatlands in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

291.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $241,000.00 pursuant to the fraudulent bills submitted through Flatlands.

292.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
### AGAINST DUBLIN AND TSIRLIN
(Violation of 18 U.S.C. § 1962(d))

293.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 292 above.

294.    Flatlands Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

295.    Dublin and Tsirlin are employed by and/or associated with the Flatlands enterprise.

296.    Dublin and Tsirlin knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Flatlands enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than 22 months

seeking payments that Flatlands was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by Flatlands employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

297.    Dublin and Tsirlin knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

298.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $241,000.00 pursuant to the fraudulent bills submitted through Flatlands.

299.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**AGAINST FLATLANDS AND DUBLIN**
(Common Law Fraud)

300.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 299 above.

301.    Flatlands and Dublin intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

302.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iii) in every claim for services provided by anyone other than Dublin, the representation that the services were performed by Flatlands' employees, when in fact they were not.

303.    Flatlands and Dublin made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

304.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $241,000.00 based upon the fraudulent charges.

305.    Flatlands' and Dublin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

306.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
### AGAINST TSIRLIN
(Aiding and Abetting)

307.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 306 above.

308.    Tsirlin knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Flatlands and Dublin. The acts of Tsirlin in furtherance of the fraudulent scheme include: (i) knowingly conducting medically unnecessary Consultations in exchange for payment of money from Flatlands and Dublin; and (ii) knowingly recommending and performing medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Flatlands and Dublin.

309.    The conduct of Tsirlin in furtherance of the fraudulent scheme is significant and material. The conduct of Tsirlin is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the performance of the fraudulent Consultations, the recommendations for and performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Flatlands and Dublin to obtain payment from Allstate and from other insurers.

310.    Tsirlin aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Flatlands for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

311.    The conduct of Tsirlin caused Allstate to pay more than $241,000.00 based upon the fraudulent charges submitted through Flatlands.

312. Tsirlin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

313. Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
## AGAINST FLATLANDS, DUBLIN, AND TSIRLIN
(Unjust Enrichment)

314. Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 313 above.

315. As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

316. When Allstate paid the bills and charges submitted by or on behalf of Flatlands for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

317. Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

318. Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

319. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $241,000.00.

## FIFTEENTH CAUSE OF ACTION
## AGAINST ALLEYNE
(Violation of 18 U.S.C. § 1962(c))

320.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 319 above.

321.    Michael Alleyne Medical Doctor, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

322.    Alleyne knowingly has conducted and/or participated, directly or indirectly, in the conduct of MAMD's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that MAMD was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by MAMD employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

323.    MAMD's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Alleyne operates MAMD, insofar as MAMD is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for MAMD to function.

82

Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the the Defendants continue to attempt collection on the fraudulent billing submitted through MAMD to the present day.

324.     MAMD is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by MAMD in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

325.     Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $118,000.00 pursuant to the fraudulent bills submitted through MAMD.

326.     By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
## AGAINST ALLEYNE AND MAMD
(Common Law Fraud)

327.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 326 above.

328.     Alleyne and MAMD intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

329.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were

medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iii) in every claim for services provided by anyone other than Alleyne, the representation that the services were performed by MAMD's employees, when in fact they were not.

330.    Alleyne and MAMD made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

331.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $118,000.00 based upon the fraudulent charges.

332.    MAMD's and Alleyne's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

333.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
### AGAINST ALLEYNE AND MAMD
(Unjust Enrichment)

334.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 333 above.

335.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

336.    When Allstate paid the bills and charges submitted by or on behalf of MAMD for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

337.    Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

338.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

339.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $118,000.00.

## EIGHTEENTH CAUSE OF ACTION
## AGAINST SHAROBEEM
(Violation of 18 U.S.C. § 1962(c))

340.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

341.    VAS Medical, P.L.L.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

342.    Sharobeem knowingly has conducted and/or participated, directly or indirectly, in the conduct of VAS' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over two years seeking payments that VAS was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically

necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed by independent contractors rather than by VAS employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

343.   VAS' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sharobeem operates VAS, insofar as VAS is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for VAS to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the the Defendants continue to attempt collection on the fraudulent billing submitted through VAS to the present day.

344.   VAS is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by VAS in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

345.   Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $199,000.00 pursuant to the fraudulent bills submitted through VAS.

346.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
### AGAINST SHAROBEEM AND VAS
(Common Law Fraud)

347.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 346 above.

348.    Sharobeem and VAS intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

349.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iii) in every claim for services provided by anyone other than Sharobeem, the representation that the services were performed by VAS' employees, when in fact they were not.

350.    Sharobeem and VAS made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

351.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $199,000.00 based upon the fraudulent charges.

352.    VAS' and Sharobeem's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

353.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**AGAINST SHAROBEEM AND VAS**
(Unjust Enrichment)

354.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

355.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

356.    When Allstate paid the bills and charges submitted by or on behalf of VAS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

357.    Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

358.    Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

359.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $199,000.00.

## JURY DEMAND

360.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff Allstate Insurance Company demands that a Judgment be entered in its favor:

A.    on its First Cause of Action, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to Allstate;

B.    on its Second Cause of Action against Williams, for more than $463,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    on its Third Cause of Action against Williams and Tsirlin, for more than $463,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    on its Fourth Cause of Action against Targee and Williams, for more than $463,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    on its Fifth Cause of Action against Tsirlin, for more than $463,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.    on its Sixth Cause of Action against Targee, Williams, and Tsirlin for more than $463,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.   on its Seventh Cause of Action against Bley, for more than $249,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.   on its Eighth Cause of Action against Allmed and Bley, for more than $249,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.   on its Ninth Cause of Action against against Allmed and Bley, for more than $249,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.   on its Tenth Cause of Action against Dublin, for more than $241,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.   on its Eleventh Cause of Action against Dublin and Tsirlin, for more than $241,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.   on its Twelfth Cause of Action against against Flatlands and Dublin, for more than $241,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.   on its Thirteenth Cause of Action against Tsirlin, for more than $241,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.     on its Fourteenth Cause of Action against Flatlands, Dublin, and Tsirlin for more than $241,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

O.     on its Fifteenth Cause of Action against Alleyne, for more than $118,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.     on its Sixteenth Cause of Action against MAMD and Alleyne, for more than $118,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.     on its Seventeenth Cause of Action against against MAMD and Alleyne, for more than $118,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.     on its Eighteenth Cause of Action against Sharobeem, for more than $199,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.     on its Nineteenth Cause of Action against VAS and Sharobeem, for more than $199,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.     on its Twentieth Cause of Action against against VAS and Sharobeem, for more than $199,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

U.     awarding Plaintiff its costs including reasonable attorneys' fees, and any other relief the Court deems just and proper.

91

Dated: May 16, 2013

RIVKIN RADLER LLP

By:_____
   Barry I. Levy (BL 2190)
   Max Gershenoff (MG 4648)
   Michael Stanton (MS 1772)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000
(516) 357-3333 (facsimile)

*Counsel for Plaintiff Allstate Insurance Company*